NOT DESIGNATED FOR PUBLICATION

No. 128,086

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellant*,

v.

JOSE CARLOS CASTILLO-ALEGRIA,
*Appellee*.

MEMORANDUM OPINION

Appeal from Finney District Court; CHRISTOPHER SANDERS, judge. Oral argument held January 6, 2026. Opinion filed July 17, 2026. Reversed and remanded with directions.

*Nicholas C. Vrana*, deputy county attorney, *Susan Lynn Hillier Richmeier*, county attorney, and *Kris W. Kobach*, attorney general, for appellant.

*Patrick H. Dunn*, of Kansas Appellate Defender Office, for appellee.

Before ISHERWOOD, P.J., CLINE and COBLE, JJ.

ISHERWOOD, J.: In Kansas, nearly every person charged with a felony has a statutory right to have the district court subject the State's evidence to a preliminary examination. During that hearing, the State's burden is two-fold, but the bar is low. It must prove that its evidence is sufficient to establish that a crime was committed and that there is probable cause to believe that the accused was responsible for the commission of that offense. That examination resulted in an adverse finding for the State here. The district court concluded that the State failed to sustain its burden and dismissed multiple counts of aggravated human trafficking and related charges pending against Jose Carlos

1

Castillo-Alegria for conduct involving the transport of laborers from Texas to assist with his agricultural operation in Finney County. Confident of the efficacy of its charges and evidence, the State filed this interlocutory appeal. We have carefully reviewed the extensive record that memorialized the lengthy preliminary hearing, the issues as briefed by the parties, and the oral arguments presented to this court. Having done so, we conclude from the totality of the evidence offered by the State, and viewing all inferences from that evidence in the State's favor as the probable cause standard requires, it was sufficient to enable each of the charges pending against Castillo-Alegria to go forward to trial. Accordingly, the decision of the district court is reversed, and the case is remanded with directions to reinstate the complaint in full and for further proceedings in conformity with this opinion and the will of the parties.

FACTUAL AND PROCEDURAL BACKGROUND

The evidence adduced at the preliminary hearing provided an explanation for the district court as to how Castillo-Alegria ended up on the radar of Finney County law enforcement. It illustrated that Sergeant Jason Hoke and Deputies Joe Barrientos and Mayra Canto from the Finney County Sheriff's Department were dispatched in August 2023 to a trailer owned by Jose Carlos Castillo-Alegria in response to a report he made concerning people using marijuana at his trailer who were not permitted to be there. Castillo-Alegria explained to the dispatcher that he recruited the individuals from Texas to come work for him, but they failed to report to work for several days so they were not permitted on his property.

Upon the law enforcement officers' arrival, they briefly made contact with Castillo-Alegria and then approached a group of people who lived in his nearby trailer, including two minor males, D.L.R. and A.R. The young men told the officers that they were 17 years old and originally from Dallas, but someone drove them up to Garden City roughly two weeks earlier to work for Castillo-Alegria. They told the officers they did

2

not intend to continue to do so, however, because Castillo-Alegria stopped paying them. Sergeant Hoke remarked to his colleagues that he believed Castillo-Alegria trafficked the minors for labor.

The officers inquired whether the young men had a way back to Dallas, and they responded that there was apparently someone who could take them the following Saturday, but they did not know the person's name or if they would have to pay for transportation. The officers suspected that this driver was a trafficker that worked for Castillo-Alegria.

The young men told the officers that they decided to come work for Castillo-Alegria because D.L.R.'s cousin, Ronel Avila, promised they would have food, a place to live, and a good paying job. This information deepened the officers' suspicion that Avila and Castillo-Alegria were engaged in human trafficking.

Deputy Barrientos returned to where Castillo-Alegria was standing and engaged him in small talk about his business. He then explained the limitations placed on law enforcement officers with respect to what they can and cannot do when it comes to entering a residence. During this conversation, Castillo-Alegria told Barrientos that he informed the young men earlier that "pay hour" would be at 5 p.m. at the pawn shop and after they got paid, he wanted them out of the trailer. He shared with Barrientos that he contacted dispatch to get the young men "a little scared" because "once they see law enforcement" they will know Castillo-Alegria "wasn't f—ing around."

Castillo-Alegria continued to chatter and told Deputy Barrientos that the people in the mobile home had worked for him for about two weeks, for an hourly rate, and typically received their paycheck every Saturday at 5 p.m. He explained that would not be the case for the current week, however, because he had not yet received payments from the farmers who contracted with him for labor. His business—Castillo

Contractors—provided contract agricultural labor to local farmers. Castillo-Alegria acknowledged that several of his guys were not in the country legally and remarked "but they're f—ing hard workers, you know?"

The evidence adduced by the State during the preliminary hearing provided the district court with this backdrop that also served to establish a general foundation for its charges. It then elicited the testimonies of those individuals directly impacted by Castillo-Alegria's operation to demonstrate for the judge why Castillo-Alegria's conduct warranted charges for aggravated human trafficking and related offenses.

*A.R.*

A.R. informed the district court, through his testimony, that he was originally from Honduras and was one of the 17-year-old young men present at the trailer on the day in question. A.R. explained that a man who worked for Castillo-Alegria promised A.R. a job in Kansas that would pay him $18 an hour and provide him with a place to sleep. He was persuaded and traveled with the man from Dallas to Garden City where he worked for Castillo-Alegria removing weeds from cornfields from 6 in the morning until 4 or 5 in the afternoon. When A.R. arrived in Garden City, he had no money or food, so Castillo-Alegria loaned him $50 for food.

A.R. informed the district court that despite being told while still in Texas that Castillo-Alegria's hourly wage was $18, the first paycheck A.R. received equated with only $14 an hour. A.R. and others told Castillo-Alegria that if that was going to be the rate of pay going forward, they were going to stop working. Castillo-Alegria responded that they could not live in the trailer if they did not work for him.

A.R. and D.L.R. left the trailer and used part of their first paychecks to pay for a night at a hotel. They became concerned after that, however, when they could not find

anywhere else to stay or transportation back to Texas. A.R. considered buying a bus ticket but was forced to abandon the idea because he needed help with the purchase but had no one to turn to. The two gave up and returned to the trailer where Avila spoke with Castillo-Alegria on their behalf so they could return to work.

The district court learned through A.R. that he was never required to provide any documents or identification in order to work for Castillo-Alegria. The young man acknowledged that while no one physically threatened him or forced him to return to work for Castillo-Alegria, or even to remain in Garden City, he stayed because it was the best option available.

*D.L.R.*

Like A.R., D.L.R. was also originally from Honduras; D.L.R. did not have resident or citizenship status in the United States. He was only 16 years old when he first worked for Castillo-Alegria in 2022. At that time, he received $15 an hour removing weeds from cornfields and, while he was required to pay rent at the trailer, he did not have to pay for transportation to the job sites. D.L.R. returned to Texas three months later.

According to D.L.R.'s testimony, Avila worked for Castillo-Alegria to recruit and transport workers from Texas to Garden City. When Avila arrived on a recruitment trip in the summer of 2023, he asked D.L.R. whether he was interested in a job since he was not currently working. Avila told D.L.R. he would be paid $800 per six-day work week, and Avila also promised to drive D.L.R. back to Texas in two weeks. Avila did not disclose that D.L.R. would have to pay him for the transportation from Texas. D.L.R. opted to return to Garden City with Avila and work for Castillo-Alegria again. Once they returned to Kansas, Castillo-Alegria told D.L.R. he needed to pay for the trip from Texas.

D.L.R. informed the district court that he was required to pay $10 each day for a ride to and from the fields and was only paid for hours worked in the fields. Castillo Contractors calculated D.L.R.'s wages as $14 per hour for 28.25 hours over four days; far less than the $800 paycheck Avila promised when he recruited D.L.R. in Texas. The company then deducted $75 to cover D.L.R.'s ride from Texas, $50 to repay the loan he received to buy food when he arrived, and $40 to account for the cost of four days of transportation to and from the fields. D.L.R.'s total paycheck after those deductions was only approximately $230. He was upset about that amount and told Castillo-Alegria he wanted to leave. Castillo-Alegria warned that if he quit, he would have to leave the trailer and would not receive a ride back to Texas. D.L.R. corroborated A.R.'s assertion that the two left the trailer and stayed at a motel for one night but returned to the trailer the following day because they had nowhere else to go. He acknowledged that no one ever physically forced him or his coworkers to work or threatened them for not working hard enough.

*Delsi Rodriguez*

Delsi Rodriguez, another Honduran native, arrived in Garden City in May 2023. A man approached her one day while she was shopping and recruited her to work in the fields for Castillo-Alegria. Rodriguez characterized Castillo-Alegria's treatment of her as disrespectful and offered as an example that while working together, he touched her shoulder and told her she was pretty. Rodriguez explained she was often fearful while at work because she overheard threats about calling immigration or the police.

Rodriguez informed the district court that while the man who recruited her promised that the rate of pay was $13 an hour, she was never paid for the work she performed. She testified that the work was completed over the span of four weeks during which she worked Monday through Friday for 10 hours a day. Unlike the other laborers, Rodriguez was unable to work Saturdays because she had a daughter to look after.

6

Whenever Rodriguez inquired about her pay, Castillo-Alegria told her "to wait." Eventually, Rodriguez determined that he was not going to pay her, and she quit.

*Francisco Murillo*

Francisco Murillo, another Honduran immigrant, testified to a similar version of events. He recalled agreeing to leave Texas in the summer of 2023 to work for Castillo-Alegria in Garden City because he needed a job, and Castillo-Alegria did not require him to have a visa, permanent residence card, or authorization to work in the United States. Murillo told the judge that the housing Castillo-Alegria provided in conjunction with the employment consisted of a trailer that initially housed 6 people, but the total number of occupants increased to as many as 20, including some minors.

Murillo corroborated the statements of others who testified that Castillo-Alegria would not pay workers for all their hours and did not tell them up front about the daily $10 transport fee to the fields until it was evident by the deductions from the total pay they received. Murillo explained to the district court that names were written down on timesheets and submitted to farmers for payment based upon the number of workers present on a given day but that those timesheets were usually short on hours. He told the judge that he occasionally asked about the missing hours or money but did not push the issue for fear of losing his job. According to Murillo, Castillo-Alegria also argued with the workers and contacted the police on a couple of occasions.

*Preliminary Hearing Testimony from Law Enforcement*

The State also relied on testimony from law enforcement officers to substantiate its charges against Castillo-Alegria. Captain Jennifer Rogers of the Finney County Sheriff's Office testified that the people Castillo-Alegria wanted removed from his trailer, including A.R. and D.L.R., were not legally present in the United States. She further

explained that officers seized several paychecks from Castillo-Alegria's residence on August 14, 2023, including those for A.R., D.L.R., and Murillo. According to Captain Rogers, the checks were dated August 12, 2023, but Castillo-Alegria's bank account lacked adequate funds to honor all the employee checks that were seized.

Captain Rogers testified that she received training in the investigation of human trafficking cases and explained that a person with no legal status in the United States is more easily controlled, particularly when they harbor a fear of law enforcement officers. Thus, threatening those trafficked individuals with a call to authorities often provides an effective means for exerting control over them. Notably, in that vein, the district court was informed that an interview with another of Castillo-Alegria's employees during the investigation yielded information that Castillo-Alegria would threaten to call police if the laborers balked about their paychecks.

Sergeant Hoke, along with Deputies Barrientos and Canto, also played a role in the State's presentation of its case. Hoke testified that when he walked through the trailer where Castillo-Alegria housed his workers, he detected the smell of sewage and observed that the only food in the home was inedible as it was either rotten or covered in mold. Hoke further asserted that the case involved elements that he recognized as indicators of human trafficking.

Deputy Canto similarly testified and noted that in addition to an absence of food there also was not any furniture in the trailer and "however many people lived in that trailer house, and they had them, like, in—like, pretty much, like, animals." She observed a young minor and noted that conditions in the trailer were not suitable "for a minor to be living there." That individual pointed out an additional nearby location to Canto, and upon investigating that residence, Canto found several significantly younger children inside who did not work in the fields, but who shared with Canto that they had not

8

attended school since arriving. Like Hoke, Canto suspected human trafficking and promptly notified other agencies and investigators.

Deputy Canto acknowledged that the laborers came to Kansas on their own accord and that it was legal to employ temporary farm workers 16 years of age and older from out-of-state. She recognized that while Kansas law did not require employers to provide food or shelter for their employees, in this instance the laborers were assured such amenities, but they proved to be "false promises" in the end. Further, while the laborers did not receive the paychecks Castillo-Alegria promised as a lure to get them to Kansas, they risked termination and loss of shelter if they missed a day of work. According to Canto, it was the full array of false promises, viewed in conjunction with the reality of the situation upon the laborers' arrival, that prompted her to suspect human trafficking was occurring.

*Castillo Contractors*

Castillo-Alegria operated Castillo Contractors to generate income for his own financial benefit. The laborers solely weeded cornfields, and its workforce consisted of United States citizens, noncitizens with work visas, and undocumented noncitizens. The majority of its laborers were temporary and came to the business as friends or relatives of current employees or through Castillo-Alegria's recruitment efforts in Texas.

If the laborers required housing, Castillo-Alegria provided trailer homes with functional kitchens, air conditioning, and bathrooms, but he did not offer food or furniture. Accordingly, the laborers slept on the floor with blankets for beds and used their clothing as pillows. While they were not required to live in the trailers, alternative housing was not available. Additionally, the fields were located 30 to 45 minutes away and Castillo-Alegria charged each laborer a fee of $10 a day for transportation to the work sites. They were free to use alternative transportation if they had access to it.

9

The compensation Castillo Contractors provided fell at a rate that was between $12 and $15 per hour. To generate the daily timesheets, the laborers lined up at the beginning of the shift and either provided their names or wrote them on the timesheet, followed by their start time and, correspondingly, their end time at the conclusion of the shift. Employees received weekly paychecks, typically at the end of the workday on Saturdays. The Saturday work shift usually ended early so the laborers had time to cash their checks at the AAA Pawnshop before it closed. Several timesheets were admitted into evidence for the district court to review. Finally, the State admitted evidence to demonstrate that the checks D.L.R., A.R., and Murillo received from Castillo Contractors failed to compensate them for 7 or 8 of the hours they worked.

*Castillo-Alegria's Response to the State's Preliminary Hearing Evidence*

Administrative Lieutenant Jerry Hahn served as a public information officer for the Finney County Sheriff's Office. In August 2023, he posted a release, prepared by the Finney County Attorney's Office, to the sheriff department's Facebook page soliciting individuals who previously worked at Castillo Contractors to contact either Crimestoppers or the Finney County trafficking hotline. According to the release, the sheriff's department would also connect callers with resources and services through which it might be possible to obtain continued presence/work certification that allowed them to lawfully remain in the United States.

Defense counsel called Nolvia Pena-Alvarez, to question her, in part, about the post. Pena-Alvarez testified that she and her son, Darvin Pena, came from Honduras to the United States in 2018 without documentation. They eventually landed in Garden City to work for Castillo-Alegria. Pena-Alvarez testified that she worked for Castillo Contractors until August 2023. Checks seized by the sheriff's department confirmed that Pena worked for Castillo-Alegria in 2018 and 2019 and that Pena-Alvarez worked for Castillo-Alegria in 2018.

Defense counsel confronted Pena-Alvarez with documentation, including disciplinary reports and termination paperwork, that seemingly indicated that Pena-Alvarez worked for at least two other businesses, rather than for Castillo-Alegria, during the first half of 2023. Those documents prompted defense counsel to inquire whether Pena-Alvarez was simply posing as a trafficking victim with the hope of obtaining a visa to remain in the United States. She acknowledged that a man named Carlos Matute-Matute spoke with her and her niece about testifying in exchange for a visa.

Matute-Matute was then called as a witness and testified that he worked for Castillo-Alegria in 2018 and 2019 and overlapped with the terms of Pena-Alvarez and her son. He claimed that Pena-Alvarez contacted him following Castillo-Alegria's arrest and shared that people who never worked for Castillo-Alegria planned to testify for an opportunity to get permission to stay in the United States.

*The District Court's Decision*

Several months after the conclusion of the preliminary hearing, the parties reconvened for the district court to issue its decision. The judge advised the parties that given his vast experience with preliminary hearings he "kn[e]w that the burden at a preliminary hearing is more likely than not for both the crimes alleged and the person alleged to have done those." The judge then announced the ruling he drafted at some point prior to his arrival. Specifically, he found that the laborers were offered and were ultimately paid an agreed upon wage and voluntarily traveled from Texas to Kansas to perform the work. The judge opined that to the extent there was a "discrepancy on how much they were to be paid and how much they were actually paid," that was "certainly an issue that could be brought up in a different venue." He further found that once in Kansas the laborers were under no obligation to stay and "were free to leave any time."

11

The district court turned then to the living arrangements that Castillo-Alegria provided to his laborers and determined that while the conditions "may not have been ideal," the laborers were not "forced" to live there, and the trailer was simply part of the "employment package" Castillo-Alegria offered his workforce. In the event it was an actionable matter, it was more appropriately considered a landlord-tenant dispute rather than an employment issue. The judge addressed the laborers' assertions that they lacked any means by which to return to Texas if they decided to quit the job. He found such travel options were not part of their agreement with Castillo-Alegria and that they were "never promised a return trip at the end of the employment." With respect to the juveniles in particular, their lack of housing upon leaving the job was not properly at Castillo-Alegria's feet. Rather, they opted to quit so they were simply "without part of an employment package at that time."

The judge moved on to the issue of credibility because he was "allowed to do that" and, therefore, did so in arriving at his decision on the case. He determined that the testimony offered at the preliminary hearing was not sufficient to satisfy the State's burden of "more likely than not," and reiterated his previous findings that the laborers were free to leave, they received a wage, and while there "[m]ay have been a disagreement about how much," that was a different matter. Finally, to the extent they were dissatisfied with any aspect of their employment with Castillo-Alegria, they were free to quit "just like any of us are at our job with the consequences that we face for quitting a job." The judge concluded that the State failed to meet its burden with respect to each of the offenses it charged.

The State promptly requested reconsideration of that decision because the district court applied the wrong standard—more likely than not—when it should be probable cause. The judge regrouped and announced that probable cause did not exist because he was not convinced "any other jury would find anything different than that and certainly not . . . beyond a reasonable doubt." He concluded with the final point that whether

12

Castillo-Alegria lacked adequate funds to pay the laborers such that the checks he issued "may have bounced" was of no significance. Rather, that was simply a matter of "bad banking," as opposed to any indication of trafficking or involuntary servitude.

The State timely brought the matter before this court for a determination of whether the district court analyzed the evidence in accordance with the proper standard for a preliminary hearing and whether its decision to dismiss all charges against Castillo-Alegria is legally sound.

LEGAL ANALYSIS

I. *Did the district court err when it dismissed the charges of aggravated human trafficking that were specific to A.R. and D.L.R.?*

The State argues that the evidence adduced at the preliminary hearing demonstrated each aspect of what A.R. and D.L.R. experienced while employed by Castillo-Alegria and that evidence was sufficient to establish that the young men were subjected to involuntary servitude. Thus, there was probable cause to believe that Castillo-Alegria committed two offenses of aggravated human trafficking.

While in Dallas, the minors were promised a specific wage by someone in Castillo-Alegria's employ and then transported to Kansas by that same person. Within their first week the young men did not receive the hourly rate they were promised before departing Dallas for the specific purpose of working for Castillo-Alegria. They attempted to cut ties with Castillo-Alegria because of the pay dispute but were ultimately forced to return to his employ the following day because they had nowhere else to go and no way to return to Texas. Castillo-Alegria argues that his actions were not coercive and he did not press A.R. or D.L.R. into involuntary servitude. This court has jurisdiction to hear an interlocutory appeal by the State from the dismissal of a complaint, information, or

13

indictment. K.S.A. 22-3602(b)(1); *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022).

*Standard of Review*

Probable cause at a preliminary examination denotes evidence that is "'sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.'" *State v. Rozell*, 315 Kan. 295, 305, 508 P.3d 358 (2022). In determining whether the State has satisfied its burden, the district court judge at a preliminary hearing "does not pass on credibility, and, when evidence conflicts, the judge must accept the version of the testimony most favorable to the State." 315 Kan. at 305 (citing *State v. Wilson*, 267 Kan. 530, 535, 986 P.2d 365 [1999]).

On appeal, we review the preliminary hearing judge's probable cause determination de novo, meaning we analyze the evidence using the same standard as the district court. *Rozell*, 315 Kan. at 305; *State v. Berg*, 270 Kan. 237, 238, 13 P.3d 914 (2000). The evidentiary threshold is a low one. See *State v. Horton*, 283 Kan. 44, 57, 151 P.3d 9 (2007). Even in those cases where the evidence is weak, if it tends to disclose that the offense charged was committed and the accused is the one responsible, then they should be bound over for trial. *State v. Washington*, 293 Kan. 732, 734, 268 P.3d 475 (2012).

The State charged Castillo-Alegria with aggravated human trafficking under K.S.A. 21-5426(b)(4). This subsection defines aggravated human trafficking as:

> "recruiting, harboring, transporting, providing or obtaining, by any means, a child knowing that the child, with or without force, fraud, threat or coercion, will be used to engage in: (A) Forced labor; (B) involuntary servitude; or (C) sexual gratification of the defendant or another involving the exchange of anything of value." K.S.A. 21-5426(b)(4).

14

There is no dispute as to the ages of the two young men or where and when the alleged offenses occurred. The dismissal of the offenses arose out of the district court's conclusion that the State failed to meet its burden to establish that Castillo-Alegria subjected the laborers to forced labor or involuntary servitude.

The State also charged alternative offenses to counts 1 and 2, alleging that Castillo-Alegria committed the offense of human trafficking in violation of K.S.A. 21-5426(a)(3)(D). That subsection of the provision requires the State to prove that Castillo-Alegria "knowingly coerc[ed] employment by obtaining or maintaining labor or services that are performed or provided by another person through . . . threatening to withhold food, lodging or clothing." K.S.A. 21-5426(a)(3)(D).

The text of K.S.A. 21-5426 is substantially similar to its predecessor, K.S.A. 21-3447(a)(2) (Torrence 2007), which defined aggravated human trafficking as "'recruiting, harboring, transporting, providing or obtaining, by any means, a person under 18 years of age knowing that the person, with or without force, fraud, threat or coercion, will be used to engage in forced labor, involuntary servitude or sexual gratification of the defendant or another.'" *State v. Williams*, 299 Kan. 911, 917, 329 P.3d 400 (2014).

Kansas caselaw, which so far has dealt exclusively with trafficking for sexual purposes, leaves an opening for the parties to dispute the terms forced labor and involuntary servitude. While our federal counterpart is not identical, it does offer some assistance. At the federal level, labor trafficking is criminalized at 18 U.S.C. § 1589 while sex trafficking is criminalized at 18 U.S.C. § 1591. Our Supreme Court has stated that the approach taken by the Kansas statute is consistent with the federal statutes regarding human trafficking offenses. *Williams*, 299 Kan. at 922.

The federal courts have similarly struggled to clearly and definitively isolate labor trafficking from less harmful and noncriminal impersonators. See, e.g., *Taylor v.*

15

*Salvation Army Nat. Corp.*, 110 F.4th 1017, 1039 (7th Cir. 2024) (Jackson-Akiwumi, J., concurring in part and dissenting in part) (arguing that the majority failed to account for more expansive definitions and increasingly subtle means of coercion than simply attempting to prevent workers from leaving). This is partly attributable to the fact that labor trafficking cases are not mirror images of one another.

> "Most public attention on human trafficking and forced labor understandably focuses on destitute victims who live on the margins of society. In this case, however, those allegedly taken advantage of were Cuban physicians, who assert that their government, through threats and intimidation, coerced them into providing medical services in Brazil, restricted their movement and contacts while abroad, and withheld and eventually confiscated the lion's share of their wages." *Rodriguez v. Pan American Health Organization*, 502 F. Supp. 3d 200, 207 (D.D.C. 2020).

See also *Hemant Patel, M.D., P.C. v. Bandikatla*, No. 24-988(L), 24-1071 (Con), 2025 WL 3264679, at *2, 7 (2d Cir. 2025) (J-1 visa holder physician with an annual salary of $150,000 was trafficked by private medical practice through abuse of law and legal process).

Not every case involves restricted movements and withholding pay as described in *Rodriguez*. The criminal nature of other actions manifest as threats to withhold food and housing. See, e.g., *Norambuena v. Western Iowa Tech Community College*, 773 F. Supp. 3d 628, 713-14 (N.D. Iowa 2025) (describing how the plaintiffs' housing was explicitly tied to their work and determining that "it would be reasonable for a jury to find that the [d]efendants used the threat of withholding food to induce plaintiffs' labor"). Another case described the coercive effect created by "a massive amount of debt that will be impossible to repay" if a worker quits, compounded by alterations to the terms and costs of the work program. *Nuñag-Tanedo v. East Baton Rouge Parish School*, 790 F. Supp. 2d 1134, 1137 (C.D. Cal. 2011). In *United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008), a family "essentially forced [their housekeeper] into slavery" with threats of arrest,

16

imprisonment, deportation, and cutting off money sent to her family in the Philippines. *Nuñag-Tanedo*, 790 F. Supp. 2d at 1145.

Returning to our case, the State argues probable cause exists to believe that A.R. and D.L.R. were subjected to forced labor or involuntary servitude because Castillo-Alegria failed to pay them the wage they agreed upon before he transported them from Dallas and coerced them into work with threats to withhold housing if they expressed dissatisfaction. K.S.A. 21-5426 does not define involuntary servitude, so the parties rely on the definition put forth in *State v. Releford*, No. 117,472, 2017 WL 6546895 (Kan. App. 2017) (unpublished opinion). The *Releford* court defined involuntary servitude as "'[t]he condition of one forced to labor—for pay or not—for another by coercion or imprisonment.'" 2017 WL 6546895, at *5 (quoting Black's Law Dictionary 1578 [10th ed. 2014]). This definition is imperfect because K.S.A. 21-5426(b)(4) specifies that coercion is not an element of aggravated human trafficking. But if involuntary servitude is defined as labor by coercion, then the criterion of coercion is again at issue.

The use of imprisonment tracks with the classic statement of involuntary servitude from *United States v. Kozminski*, 487 U.S. 931, 108 S. Ct. 2751, 101 L. Ed. 2d 788 (1988). The *Kozminski* Court interpreted involuntary servitude as prohibiting only conduct involving the use or threatened use of physical or legal coercion. 487 U.S. at 949-52. The *Kozminski* Court acknowledged that not all victims are alike and the "special vulnerabilities" of victims are relevant to "determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve" in a capacity of involuntary servitude. 487 U.S. at 952. The *Kozminski* Court, however, limited the scope of what counts as involuntary servitude by rejecting prohibitions on psychological coercion or "'a threat which seriously affects [the worker's] future welfare but as to which he still has a choice, however painful.'" 487 U.S. at 950 (quoting *United States v. Shackney*, 333 F.2d 475, 487 [2d Cir. 1964]).

17

But Congress amended 18 U.S.C. § 1589 expressly to counter this definition, adding forced labor "as a *species* of involuntary servitude," which could include nonviolent coercion. *United States v. Bradley*, 390 F.3d 145, 156-57 (1st Cir. 2004), *vacated on other grounds by Bradley v. United States*, 545 U.S. 1101, 125 S. Ct. 2543, 162 L. Ed. 2d 271 (2005). The net effect of the Congressional amendment was to "'expand[] the definition of involuntary servitude to include nonphysical forms of coercion.'" *Nuñag-Tanedo*, 790 F. Supp. 2d at 1145. "'Congress intended to reach cases in which persons are held in a condition of servitude through nonviolent coercion.'" *Muchira v. Al-Rawaf*, 850 F.3d 605, 617 (4th Cir. 2017).

Thus, this court's definition of involuntary servitude from *Releford*, which includes not just imprisonment but also coercion, tracks with federal law on labor trafficking. Federal courts applying Kansas law have treated K.S.A. 21-5426 as essentially coextensive with 18 U.S.C. §§ 1589-1591. See *Potts v. Lisonbee*, No. 24-1205-EFM-TJJ, 2025 WL 2939003, at *8 (D. Kan. 2025) (unpublished opinion); see also *Ross v. Jenkins*, 325 F. Supp. 3d 1141, 1165 (D. Kan. 2018) ("The definition of human trafficking and aggravated human trafficking in Kan. Stat. Ann. § 21-5426 largely tracks the definition of the federal statute."). And, when interpreting the Kansas statute on human trafficking, our Supreme Court relied on proponent testimony in the legislative history which urged our Legislature to use the federal statute as a model. *Williams*, 299 Kan. at 922.

At the preliminary hearing in this case, defense counsel repeatedly inquired of the State's witnesses whether Castillo-Alegria beat the workers or used physical restraints to restrict their movements. Apart from the gross impracticality of keeping field workers in chains, the lack of physical restraint has little effect on the applied legal definitions of forced labor or involuntary servitude. Several federal cases clarify why physical restraint is not a *sine qua non* for labor trafficking.

In *Bistline v. Parker*, 918 F.3d 849, 871-72 (10th Cir. 2019), the plaintiffs sufficiently pleaded violations of 18 U.S.C. § 1589 because the defendant purportedly had "control over every aspect of their lives," creating the ability to punish "'malcontents or recalcitrant followers with swift and horrendous punishments, including the loss of all shelter, food, medical care, cash, livelihood, and other essential support mechanisms necessary to an endurable daily existence.'" Amidst these abhorrent circumstances, physical restraints were deemed unnecessary.

In *Magnifico v. Villanueva*, 783 F. Supp. 2d 1217 (S.D. Fla. 2011), the plaintiffs alleged labor trafficking based primarily on threats. "To ensure that plaintiffs complied with their demanding work schedule, defendants threatened plaintiffs with arrest, imprisonment, deportation, cancellation of their visas, loss of work, lawsuits, and black-listing." 783 F. Supp. 2d at 1222. When recruiting the laborers, the defendants also promised free food, housing, and transportation only to deduct exorbitant monthly fees from the plaintiffs' paychecks for these necessities later. The plaintiffs did not allege physical violence or restraint or any threats of the same but sufficiently alleged their claims of a labor trafficking racket. 783 F. Supp. 2d at 1222, 1227-30.

In *Aguilera v. Aegis Communications Group, LLC*, 72 F. Supp. 3d 975 (W.D. Mo. 2014), the plaintiff moved from Joplin, Missouri, to India after signing up for a work-study program under false representations. When she arrived in India, she was forced to work late shifts and was not paid her monthly allowance. She was not provided with adequate living quarters as offered and endured persistent power outages along with a poor internet connection. Finally, she did not receive adequate food as agreed upon and suffered food poisoning and dysentery as a result. Her employer refused to pay for her return travel and warned that if she stopped working, she would be terminated and responsible for her own return travel cost. The import of this *Aguilera* decision is its recognition that conditions of servitude may be enforced through nonviolent coercion, as well as its acknowledgment that "'the means used by modern-day traffickers are

increasingly subtle.'" 72 F. Supp. 3d at 978 (quoting *United States v. Dann*, 652 F.3d 1160, 1169 [9th Cir. 2011]).

We recognize that not all pressure rises to the level of coercion associated with labor trafficking. The majority in *Taylor* found that the plaintiffs did not sufficiently allege claims of labor trafficking. 110 F.4th at 1031. In that case, the Salvation Army provided food, clothing, and housing to individuals struggling with homelessness or substance abuse and others who were referred as part of their probation and parole. Five former participants filed a petition claiming that the "'work therapy'" program was, in reality, forced labor. 110 F.4th at 1021.

The *Taylor* dissent found some aspects of the program to be highly coercive. For example, it required the plaintiffs to sign over their rights to collect government support, including Supplemental Nutritional Assistance Program (SNAP) and Social Security disability benefits, to the Salvation Army. Participants were also directed to forfeit personal items such as clothing, jewelry, cell phones, electronics, and many prescribed medications. These conditions made the plaintiffs fully reliant on the Salvation Army for food, clothing, and housing, impeding their ability to leave freely in any meaningful sense. *Taylor*, 110 F.4th at 1035-36 (Jackson-Akiwumi, J., concurring in part and dissenting in part).

The *Taylor* majority, however, determined that the Salvation Army's control over the plaintiffs' food, clothing, shelter, and external communications did not present "a plausible basis for concluding that a reasonable person would not have felt free to leave the program." 110 F.4th at 1031. For the plaintiffs whose "'work therapy'" was tied to probation or parole, the majority recognized "a different set of analytical problems for the parties and for us" because they were not voluntary participants. 110 F.4th at 1032. Thus, while those plaintiffs in *Taylor* certainly endured difficult circumstances, they were not trafficked. 110 F.4th at 1032.

At the other end of the spectrum lies *Reyes-Trujillo v. Four Star Greenhouse, Inc.*, 513 F. Supp. 3d 761 (E.D. Mich. 2021). A labor contractor brought workers under H-2A visas from Mexico, compelling them to assume personal loans with high interest rates to pay their out-of-pocket travel into the United States. The contractor repeatedly moved the plaintiffs between states and routinely failed to pay them or paid them with checks that had insufficient funds and could not be cashed. 513 F. Supp. 3d at 775. By the time the labor contractor brought the plaintiffs to work for the defendants, the plaintiffs were "'so desperate for money for basic necessities, including food, with no means of returning home to Mexico, that they had little choice but to work [for the defendants].'" 513 F. Supp. 3d at 776. The plaintiffs lived in migrant housing while working for the defendants. When the plaintiffs complained to the labor contractor about not getting paid, the contractor arranged to take them shopping at Walmart, only for immigration agents to arrest them as they walked off the bus at the Walmart parking lot. They were then forced to return to Mexico at their own significant expense without reimbursement. They returned to Mexico without pay for four weeks of work, without their personal belongings, and without means of getting hired again in H-2A jobs. 513 F. Supp. 3d at 777. The plaintiffs easily showed multiple violations of 18 U.S.C. § 1589, in a clear case of labor trafficking. 513 F. Supp. 3d at 794.

The case before us is rooted somewhere between *Taylor* and *Reyes-Trujillo*. These federal cases help flesh out the picture of the key disputed terms, and easily enable us to determine that the State demonstrated there was probable cause that Castillo-Alegria's actions were coercive enough to render the labor forced or the servitude involuntary.

The State argues that A.R. and D.L.R. were transported to and harbored in Finney County. It further asserts that Castillo-Alegria used withholding housing and the threat of withholding housing to compel the minors to continue working. And the State contends that Castillo-Alegria called law enforcement before paying the minors because he could not tolerate dissent in his work force.

By providing housing, Castillo-Alegria enhanced the inherent power imbalance between employer and employee. Testimony from A.R. and D.L.R. supports the State's claim that access to lodging was a factor that compelled them into forced labor or involuntary servitude. That is, the evidence shows that they genuinely had nowhere else to go. After one night away, they requested to come back for lack of other options. As the *Kozminski* Court stated: "[A] victim's age or special vulnerability may be relevant in determining whether a particular type or a certain degree of physical or legal coercion is sufficient to hold that person to involuntary servitude." 487 U.S. at 948. Although the *Kozminski* standard for coercion is now broader, age and special vulnerability remain relevant. A.R. was a minor who could not speak English and was, at the very least, states away from friends and family. He testified that the reason he did not buy a bus ticket back to Texas was because he had no one to help him make the transaction. His age and special vulnerabilities made the threat of removing housing more coercive than it might otherwise.

Further, the evidence shows that Castillo-Alegria was willing to use the law or legal process as a method of coercion against his workers. It is clear he was willing to call police to enforce his will because that is how this case began. Police suspected trafficking when they arrived in response to Castillo-Alegria's phone call to remove A.R. and D.L.R. And, as the State correctly notes, he did not give them their paychecks first and then order them to leave. The checks were still in his possession when law enforcement officers arrived.

In total, the State presented sufficient evidence to cause a person of ordinary prudence to conscientiously entertain a reasonable belief that Castillo-Alegria had committed all the elements of aggravated human trafficking as well as the alternative charges of human trafficking. There was probable cause to believe he knowingly transported A.R. and D.L.R. to Garden City and housed them there, knowing that he would use lodging and law enforcement as tools to induce them to work. This issue is

22

sufficient to proceed beyond the first stage of litigation and the district court erred in finding otherwise.

II. *Did the district court err by dismissing the charge of human trafficking of Delsi Rodriguez?*

The next issue we must consider is the district court's dismissal of the human trafficking charges involving Rodriguez. The State contends that Castillo-Alegria recruited Rodriguez and subjected her to involuntary servitude or forced labor through the use of fraud or coercion. Castillo-Alegria counters that Rodriguez' testimony was not credible and therefore the State lacked any evidence to sustain the charge.

Again, the probable cause standard that governs our review of this matter requires us to view any inferences from the evidence as favorable to the State, without making credibility determinations. *Rozell*, 315 Kan. at 305; *State v. Fredrick*, 292 Kan. 169, 171-72, 251 P.3d 48 (2011). The State's evidence established probable cause to believe that Castillo-Alegria subjected Rodriguez to forced labor or involuntary servitude.

The difficulty with Castillo-Alegria's appellate argument is that he seeks to undercut Rodriguez' credibility by directing our focus to the testimony of her aunt, Pena-Alvarez. He extensively recounts the various fabricated claims and instances of false testimony uttered by Pena-Alvarez and her son. When asked at the preliminary hearing about her claim that she and her son were working for Castillo Contractors, Pena-Alvarez admitted, "Everything was a lie." The transcript reflects that this admission relates to statements made by Pena-Alvarez and Pena, yet Castillo-Alegria reframes the admission so that we might also include Rodriguez' testimony.

Even if we were to follow the path that Castillo-Alegria proposes, that Rodriguez' credibility was tarnished by the sins of her aunt, credibility is an issue determined by the

ultimate factfinder at a later stage. It is a consideration that is expressly excluded from our analysis. "To determine whether the State has met [its probable cause] burden, a preliminary hearing judge does not pass on credibility, and, when evidence conflicts, the judge must accept the version of the testimony most favorable to the State." *Rozell*, 315 Kan. at 305.

While the record demonstrates that Pena-Alvarez could not have worked for Castillo-Alegria, the same impossibility is not evident for Rodriguez. Specifically, Pena-Alvarez was working for PSSI until July 25, 2023. At that time, she also started working at Golden Corral. Because she could not be in two places at once, PSSI terminated her for missing work. Her claim that she also worked for Castillo Contractors would put her in three places at once, making her testimony not just an issue of credibility but of impossibility.

Rodriguez' testimony did not suffer from a similar deficiency. She testified that she worked for El Remedio in Garden City for "two or three months" beginning in May 2023. She also testified that she worked for Castillo Contractors for four weeks in July. And she stated that she worked at Golden Corral in August 2023. Drawing inferences in favor of the prosecution, Rodriguez' estimate of two or three months could mean two. She may have worked at El Remedio in May and June, then for Castillo Contractors in July, and at Golden Corral in August. Her timeline is not impossible. Castillo-Alegria points to other factors which could impact her credibility, but credibility is not at issue on this appeal from dismissal after a preliminary hearing.

The State presented evidence that Rodriguez worked for Castillo-Alegria without pay and that she remained out of fear of police involvement. The State established probable cause to believe that Castillo-Alegria recruited Rodriguez through fraud and coerced her to continue working.

24

III. *Did the district court err by dismissing the charge of participating in a human trafficking venture?*

The State also charged Castillo-Alegria with participating in a labor trafficking venture. A charge the district court also determined lacked the requisite evidentiary foundation. This offense is tied specifically to the maltreatment of A.R., D.L.R., Rodriguez, and Murillo. Castillo-Alegria responds that each employee was always free to live on their own will and that where the State failed to sustain the various human trafficking offenses, it was necessarily unable to establish that Castillo-Alegria perpetuated a human trafficking venture. We find that the evidence adduced during the course of the hearing was sufficient to enable the State to satisfy its burden to show there was cause to believe that Castillo-Alegria participated in a human trafficking venture.

The State charged Castillo-Alegria with a violation of K.S.A. 21-5426(a)(2), which alleged the commission of human trafficking by "intentionally benefitting financially or by receiving anything of value from participation in a venture that the person has reason to know has engaged in" recruiting, harboring, transporting, providing or obtaining labor through force, fraud, or coercion to induce involuntary servitude or forced labor. K.S.A. 21-5426(a)(1), (2). It is the State's position that bank records firmly establish that Castillo Contractors recruited and obtained people for agricultural labor and Castillo-Alegria benefitted financially from that venture. Castillo-Alegria does not dispute that he ran an agricultural business for financial benefit; he simply asserts that the business was not tainted with labor trafficking.

Again, the victims associated with this count included A.R., D.L.R., Rodriguez, and Murillo. As we previously extensively discussed and determined, there was probable cause to believe that Castillo-Alegria engaged in labor trafficking. We acknowledge there is additional evidence that reinforces the strength of the State's allegation. Deputy Canto

testified about, and her bodycam recorded her encounter with, other minors younger than A.R. and D.L.R.

Deputy Canto testified that other minors were housed near A.R. and D.L.R., but she did not believe those minors performed any labor as they were significantly younger than A.R. and D.L.R. Her bodycam captured discussions she engaged in with these minors and unnamed responders from unidentified agencies. Canto translated between the minors and people who, from the video, appear to be social workers of some kind. These children disclosed that they did not go to school. The presence of these children of tender years, their vulnerability to being rendered homeless or deported, and the apparent lack of attention to their needs undeniably factor into whether the adults responsible for these children felt coerced into providing labor. Parents, older siblings, or other relatives may feel compelled to work to prevent threatened harm to child relatives. Canto's brief testimony and her bodycam substantiate that Castillo-Alegria participated in a labor trafficking venture that extended beyond the four personally identified victims at the heart of this appeal and contribute to our probable cause finding for this offense.

IV. *Did the district court err by dismissing the charges of human smuggling?*

The State argues that the district court erred by dismissing the counts of human smuggling under K.S.A. 21-5432(a)(1) charged as alternative offenses to the aggravated human trafficking offenses set out under counts 1 and 2. The State, at count 9, also charged Castillo-Alegria with human smuggling of Murillo. The State argues that Castillo-Alegria transported or harbored each victim to exploit them for his financial gain when he knew or should have known they were present in the United States illegally. Castillo-Alegria responds that no evidence shows he knew or should have known they would be exploited because no one ever exploited them. We are satisfied that the State established probable cause to believe that from the outset of their arrival in Kansas, A.R.

and D.L.R. were underpaid and coerced to continue working, thereby demonstrating that Castillo-Alegria transported them to exploit them for financial gain.

> "(a)(1) Human smuggling is intentionally transporting, harboring or concealing an individual into or within Kansas when the person:
>
> (A) Knows, or should have known, that the individual is entering into or remaining in the United States illegally;
>
> (B) benefits financially or receives anything of value; and
>
> (C) knows, or should have known, that the individual being smuggled is likely to be exploited for the financial gain of another." K.S.A. 21-5432(a)(1).

At the preliminary hearing, counsel's arguments and witness questions were specifically framed as contemplating the trip from Dallas, Texas, to Garden City, Kansas, as an act of smuggling. But the statute frames transportation as "into or within Kansas," and the record clearly shows that Castillo-Alegria transported his workers within Kansas. Rodriguez testified that trips to the fields took 40 to 45 minutes; A.R. and D.L.R. testified that they rode in a van every day to the fields where they worked; and Murillo stated that Castillo-Alegria charged him $10 per day for transportation to the fields. There is no dispute that Castillo-Alegria transported the workers within Kansas.

The State further contends that the evidence also shows harboring. It notes that there are competing definitions for the term in federal courts, and counsels against the use of the minority definition employed by the Seventh Circuit: providing, or offering to provide, a secure haven, refuge, or place to stay to a known illegal alien where authorities would be unlikely to seek him or her. See *United States v. Costello*, 666 F.3d 1040, 1050 (7th Cir. 2012). In *Costello*, the defendant's conviction was overturned because her boyfriend, who was present in the United States without authorization, simply lived with her. No evidence showed that the defendant attempted to conceal or shield him from detection. 666 F.3d at 1046-49.

The State instead urges this court to define harboring as "substantially facilitating" an alien to remain in the United States illegally, in line with the Second, Third, Fifth, Eighth, and Eleventh Circuits. See *United States v. Tipton*, 518 F.3d 591, 595 (8th Cir. 2008); *United States v. Cantu*, 557 F.2d 1173, 1180 (5th Cir. 1977). But the State has miscounted the circuits. In *United States v. Kim*, 193 F.3d 567, 574 (2nd Cir. 1999), the Second Circuit defined harboring as "conduct tending substantially to facilitate an alien's remaining in the United States illegally and to prevent government authorities from detecting his unlawful presence." Thus, the State presents an incomplete definition by stating that harboring means substantially facilitating remaining in the United States, while omitting the criterion of avoiding detection. The Second Circuit's definition then is truly similar to that from the Seventh Circuit's. See *United States v. Ozcelik*, 527 F.3d 88, 100 (3rd Cir. 2008); see also *United States v. Zheng*, 306 F.3d 1080, 1086 (11th Cir. 2002) (The defendants harbored illegal aliens when they facilitated their ability to remain in the United States and "prevented government authorities from detecting the illegal aliens' unlawful presence."). The final count provides that the Second, Third, Seventh, and Eleventh Circuits require an act of harboring to include some attempt to avoid detection, while only the Fifth and Eighth Circuits do not. If the Kansas definition of harboring under our human smuggling statute were to align with federal caselaw, then harboring should mean providing, or offering to provide, a secure haven, refuge, or place to stay to a known illegal alien where authorities would be unlikely to seek him or her. But if Castillo-Alegria did not harbor his workers, he nevertheless transported them.

The State asserts that Castillo-Alegria transported A.R., D.L.R., and Murillo within Kansas while he knew or should have known that they were present in the United States without a legal status. The State points to testimony that Castillo-Alegria never asked for documents to confirm work authorization, and that while speaking with Deputy Barrientos, Castillo-Alegria acknowledged that a portion of his workforce was not in the United States legally. The State characterizes this willful ignorance as "an ostrich defense," asserting that his failure to seek documentation shows he was aware his

workers were illegal aliens and he avoided confirming that fact on paper. Castillo-Alegria's direct statement in bodycam footage that he knew some workers were present illegally provides sufficient probable cause to show knowledge.

The State's claim centers on work without pay and exploitation as it argues that Castillo-Alegria shorted A.R., D.L.R., and Murillo on the hours they worked and failed to pay Rodriguez at all. It directs our attention to the timesheets and paychecks as evidence that the discrepancy was established at the preliminary hearing.

Castillo-Alegria concedes that the paychecks were short hours but contends the employees would not be paid for the hours worked on Saturdays because they were given their checks on Saturdays. "[I]t would be difficult, if not impossible, to end the workweek on a Saturday and, given the approximately 80 employees who work for [Castillo Contractors], to calculate the amount of those paychecks and to draft them in time to pay those employees by the end of that same Saturday workday." While the explanation may be plausible, it is not based on evidence presented at the preliminary hearing. There is no evidence that their paychecks ran from the previous Saturday through Friday, meaning they would get paid for their last day of work on the following week. The State's preliminary hearing evidence showed that A.R., D.L.R., and Murillo were underpaid and Rodriguez was unpaid. Thus, the evidence at the preliminary hearing established probable cause to believe that Castillo-Alegria exploited his workers.

V. *Did the district court err by dismissing the racketeering charge?*

The State argues that it presented two ways in which Castillo-Alegria's actions fell within the definition of racketeering, and the district court erred in finding that the State's evidence was insufficient to establish either form. Castillo-Alegria argues that he was not engaged in trafficking, so it goes without saying that he was likewise not engaged in a trafficking racket.

29

The plain language of the racketeering statute shows a conceptual order. Castillo-Alegria correctly notes that the State must show that he is a "covered person" for the statute to apply. K.S.A. 21-6329(a)(3) states that "it is unlawful for any covered person . . . employed by, or associated with, any enterprise to recklessly conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the collection of an unlawful debt." The parties do not dispute that Castillo Contractors was an enterprise and that Castillo-Alegria was associated with it.

But the State makes the mistake of assuming that Castillo-Alegria is a covered person so that it can skip ahead and define "racketeering activity." Our Legislature's definition of racketeering at K.S.A. 21-6328(f) provides a direct link to federal law. This subsection provides that racketeering activity is "to commit, attempt to commit, conspire to commit or to solicit, coerce or intimidate another person to commit" the crimes listed in subsection (f)(1). K.S.A. 21-6328(f). K.S.A. 21-6328(f)(1) provides a list of Kansas crimes which qualify. But K.S.A. 21-6328(f)(2) points to "conduct defined as 'racketeering activity' under 18 U.S.C. § 1961(1)."

The State points out that 18 U.S.C. § 1961(1)(F) identifies as a racketeering activity "any act which is indictable under the Immigration and Nationality Act [INA], section 274." Then the State calls this court's attention to section 274 of the INA, codified at 8 U.S.C. § 1324. A person violates section 274 if that person

> "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law." 8 U.S.C. § 1324(a)(1)(A)(ii).

The State argues that Castillo-Alegria transported A.R., D.L.R., and Murillo in reckless disregard of their unlawful status and that such transportation for the purposes of

30

employment promoted their continued illegal presence in the United States. See *United States v. Barajas-Chavez*, 162 F.3d 1285, 1288 (10th Cir. 1999). The State's construction of K.S.A. 21-6329 leads to an argument that Castillo-Alegria committed racketeering in two ways. First, he engaged in a labor trafficking racket. Second, he transported illegal aliens in reckless disregard of their status in furtherance of their continued illegal presence in the United States. This second version of racketeering is not legally sound.

Our first observation about the State's racketeering activity argument is that it lowers the State's burden of proof. Specifically, it requires the State to show that (1) Castillo-Alegria recklessly disregarded alien status, (2) he transported the alien or aliens, and (3) the transportation furthered their continued presence in the United States. If the State shows those elements, without the need to demonstrate human trafficking or aggravated human trafficking, then the State has shown a violation of section 274 of the INA. Racketeering activity under 18 U.S.C. § 1961(1) includes a violation of section 274, so the State would then have shown racketeering activity under federal law. And K.S.A. 21-6328(f)(2) criminalizes racketeering activities in Kansas listed at 18 U.S.C. § 1961(1). Thus, the State's argument focuses on transportation, arguing that by showing Castillo-Alegria transported workers from Texas to Kansas it established a racketeering activity.

But as Castillo-Alegria correctly points out, the State must establish more than a racketeering activity. By its plain text, K.S.A. 21-6329(a) applies only to "any covered person." K.S.A. 21-6328(b) defines a covered person, and subsections (b)(1), (b)(3), and (b)(4) relate to—respectively—street gangs, controlled substances, and identity theft or identity fraud. The only definition of a covered person which would be relevant to the facts of this case is a person who "has engaged in or is engaging in any conduct prohibited by K.S.A. 21-5426, and amendments thereto, human trafficking or aggravated human trafficking." K.S.A. 21-6328(b)(2). The State must show that Castillo-Alegria is a covered person. If the State does that successfully, then it becomes relevant whether he engaged in a racketeering activity. Thus, Castillo-Alegria is correct that the State's case

31

hinges on showing he is a covered person by showing that he engaged in human trafficking or aggravated human trafficking.

But Castillo-Alegria is incorrect that the State failed to show sufficient evidence to establish probable cause for aggravated human trafficking or human trafficking. The State's evidence at the preliminary hearing satisfied its burden to show that there was probable cause to believe that Castillo-Alegria was a covered person engaged in a racketeering activity under K.S.A. 21-6329. The district court erred by dismissing this charge.

The evidence adduced by the State during the lengthy preliminary hearing was sufficient when viewed through the probable cause lens, which is the appropriate standard governing preliminary hearings. The district court erred when it dismissed each charge filed in this case and declined to allow this rather significant case to go before a jury or otherwise be subjected to the rigors of a criminal trial. While we refrain from offering a prediction of what the outcome would be from any such proceeding, we can confidently state that this case should go forward to litigation. Accordingly, the State's case is remanded with directions to reinstate the criminal complaint and move forward in a manner consistent with this opinion.

Reversed and remanded with directions.